The 4th District Appellate Court of the State of Illinois has now convened. The Honorable James A. Kinect presiding. This is our case number 4-20-0490. Carol Cleeton vs. SIU Healthcare, etc., Memorial Medical Center, et al. Would the counsel for appellant please state your name for the record? Yes, Your Honor. Thank you. My name is Timothy Shea. I'm here on behalf of the plaintiff and appellant, Carol Cleeton. Thank you. And for the appellee? Good afternoon, Your Honor. Alana Eisenstein on behalf of the defendants, Appellees Medtronic, Sue Farrell, and Stephanie Woolley. Thank you. You may proceed, Mr. Shea. Yes, may it please the court, counsel. We are here regarding this appeal of a dismissal by summary judgment against Medtronic. And the two areas that I want to focus on today is duty, specifically with that with respect to Stephanie Woolley and the preemption argument. The court stated that Medtronic and its employees had no duty to troubleshoot. And she further stated that the plaintiff has alleged no facts that draw an inference that Medtronic defendants undertook any legal duty beyond that, which was requested by the medical provider and to do so would make them medical providers. And I think that's the focus of what her ruling centered on. I think she bought the argument by Medtronic that what we were doing was asking the court to impose a duty on Medtronic technicians to act as health care providers. And that is not the truth because our allegations, and especially with Woolley, who was the first to see Mr. Clayton on the evening of October 29th, 2017, which was the most important time to determine whether there was an issue with the device itself and the troubleshoot. Now, we allege that she failed to troubleshoot and assist medical personnel with the pump and catheter. And especially we have argued that she failed to communicate the limitations of the interrogation of the pump itself. And we've also alleged she failed to provide the medical personnel, especially Dr. Austin, on-label literature for Baclofen withdrawal syndrome. So where does this duty arise as we talk about it? And it arises from the job description. And if we look at what was provided as her job description, a Medtronic job description for sales representative pain under position responsibilities, providing product and therapy, technical support and service. Now, we haven't alleged nor have we argued that she's required to involve herself in the physician-patient privilege. And she has to have experience to call on physicians in one or more of the following related referral accounts. Neurology, physiatrist, oncology, internal medicine, or primary care physicians. She has to have familiarity with the implantable devices, which she clearly said, because she had, when she started her employment, a four-week, and it sounded like a very rigorous orientation to familiarize herself with the device and the literature. Now, her own testimony with respect to her job description, I think, is very telling. The first thing she said was patient interaction, also providing on-label materials as part of the physician engagement and training. So that was a very important aspect of what she was to do as a assistant or troubleshooter to provide this on-label information. Also, clinical and operating room execution, and that means understanding the therapies, providing all the tools necessary from Medtronic to support these cases effectively so the equipment is present and functioning. She also indicated that she had patient and device maintenance, helping patients and the practice, which would be the physicians, understand the functionality of the device and answer questions. And also, there would be awareness that there are resources available to the clinicians on the website. All right, that's what she said in her own words and put on her resume. So the next important document, which I think is really perhaps the most important document, is a document entitled Field Personnel Support for Medtronic Neuromodulation Products. And what was the purpose of this document as given to people like Woolley? And it says the purpose is to define the standards and controls for interaction of neuromodulation field personnel representatives with healthcare professionals for purposes of providing technical support, not medical support, for neuromodulation products and therapies before, during, or after surgery and follow-ups. And the policy statement on page two of this document says technical support may be provided by qualified representatives to healthcare professionals when the support is specific to Medtronic neuromodulation devices, and that's what we have in this particular case. We have the baclofen pump and catheter at issue, is consistent with approved labeling, except in limited circumstances related to safety information for a specific off-label use. There's no off-label use, but she is to provide approved labeling, and that was our allegation that she failed to do that. Number three is, does that constitute practice of medicine? And that's fair. And number four is consistent with the requirements of this policy. Now, with respect to the rationale for Medtronic technical support, even counsel made reference to this. There are a number of policy statements from prominent medical associations acknowledging the important role that medical field device personnel play in providing technical support. And I'm going to continue to underline technical support, the physicians and their staffs describing the appropriate roles of medical device field personnel. And they quote from the American Medical Association, saying that these representatives can play an important role in patient safety and quality of care by providing information about the proper use of the device or equipment, as well as technical assistance. And prior to providing this technical support, the representative must be trained on the products they support. And this is very important on page three of 10 of this document, the role of representative when providing technical support. So this would have been the role of Stephanie Woolley on October 29, 2017. The role of the representative when providing technical support is to provide in-depth product knowledge directly to physicians and other healthcare professionals related to implant use and operation of neuromodulation products to optimize patient safety and therapeutic effects. And technical support may include, but it's not limited to, information about product warnings, precautions, indications, and contraindications. And representatives may refer healthcare professionals to information contained in the FDA cleared approved labeling for Medtronic products. Ironically, that happened on day two, when there was a telephone call from a medical provider to Medtronic. And they, in turn, as part of the troubleshooting, provided the very document that should have been provided by Stephanie Woolley on October 29, 2017. And here's why this is so important, because we don't have two people that are in equal position as far as the knowledge about the product, including not only the pump, not only the reservoir, but the catheter as well. It's a very interesting operation on how it delivers a Baclofen from this reservoir on this pump through a catheter to the intended site. And she knew, as part of her training, that the catheter could be the problem. And she would have been able to provide the labeling on how to assess the patency of a catheter, because there was enough literature that the delivery of the Baclofen could be affected by catheter holes or tears. She was aware that the catheter damage could cause Baclofen withdrawal syndrome. In fact, the second day, she filed an adverse report where she said Baclofen withdrawal. She was aware of the emergency documents on Baclofen withdrawal syndrome that were actually faxed the following day, and she should have provided that day. She was aware, she says in her deposition, of the Baclofen withdrawal symptoms as part of her training. And she was also made aware by the family that there was a difficult refill just days before. So what did she focus her whole purpose in being there? Well, the court seems to argue that she was only requested to interrogate the device. But she actually did more, because with the nurse, she actually pulled other records. She pulled the October 25, 2017, office note to review to see if there were any issues, including a verification that the pump was programmed correctly, and to explain complications that Donald was presenting on October 29, 2017. So she went above and beyond the troubleshooting that was requested. She verified the record. But what she didn't do, and what she was aware of as a technical assistant, was to provide on-label literature to Dr. Austin, who knew very little, if you saw his deposition, about Baclofen withdrawal syndrome, about how the Baclofen pump and catheter operates. So she created an illusion that the Baclofen pump system was working properly, which then switched his focus from Baclofen withdrawal syndrome that was within his differential of diagnosis, to sepsis. So her failure to perform her job as dictated in the Medtronic documents left out a very important piece of information that was misleading to Dr. Austin, and was well known in the literature on-label that the Baclofen catheter was a source of the failure of the Baclofen to reach its intended site, and could cause Baclofen withdrawal syndrome. Mr. Shea, are catheters used in any number of instances after a surgery or in the medical field? Catheters, just catheters. Catheters, urinary catheters? Well, any catheter. I would be unable to tell you that, because I'm not a medical person. No, but the doctor is. Did the doctor be familiar with the catheter? Well, the doctor stated that he was unfamiliar with the Baclofen system. But that system includes a catheter, which is not a unique device. The pump is what is unique, and what is manufactured for a specific purpose. The catheter is something that is used in other medical procedures. A catheter, quote, generally is used, but this catheter was a specific catheter by its construction, by the type of materials that were used to deliver this device. But to say that catheters generally, and I would have, I beg to differ with you, Your Honor, but to say that catheters generally are well known by physicians, and therefore, he should have had familiarity with not only the fact that a catheter could fail because of holes, breaks, tears, or disengagement, of a very, this whole system, it's hard to separate the catheter from the device itself. The pump is part of a system that is put together, and each serves a purpose in the delivery of the intrathecal or of the Baclofen to the intrathecal space. And that's why it's important that during the troubleshooting, when she didn't mention anything about the catheter, didn't talk to the doctor at all about the catheter, didn't say, oh, by the way, the pump seems to be functioning properly, but there could be, and it's well known on our label, there are issues with catheters if there have been tears and the like. And there was a history provided that there was a very difficult refill that happened just days before, and there was a temporal relationship in the medical record, including the emergency room document and the triage record, that following that difficult refill, there were symptoms that were consistent with Baclofen withdrawal syndrome, of which this doctor had very little knowledge, as he stated in his deposition. And I think this is, I think the Medtronic versus Kennedy case that was relied upon by the court is really misguided, because what the plaintiffs were asking for in Medtronic versus Kennedy was for the Medtronic representative to actually intervene in the medical process itself by saying, you put the wrong lead on, this doesn't look like a safe environment, we should stop the surgery. Those were medical opinions that were separate and apart from technical assistance. Technical assistance in the Kennedy case would be testing the leads to see if they functioned properly. Testing the device that is manufactured, sold, and maintained and tested by Medtronic. These Medtronic representatives serve a very important purpose, not only just to bring cookies and pizza on Friday afternoons to medical clinics, but to when they are confronted with these situations of which they have superior knowledge to assist as defined in this document itself with the medical care providers. And I also want to say something else before I go on to the preemption. I think this case, Medtronic versus Malander, is very important for two instances. Number one, it talks about there's an assumed duty to make, this is what was held, Medtronic assumed a duty to make technical recommendations regarding the lead, the product, not medical recommendations. So that the technical support was not provided in a reasonable and prudent manner. So this situation was very similar. There was technical support that was unreasonably provided. Now I know I'm running out of time, so I want to discuss with you this preemption. Because this has baffled me from the beginning. The preemption argument, the court ruled that the plaintiff is not alleged, nor has any evidence been presented that Medtronic failed to comply with any federal regulations for the delivery of such information and warnings. Now, here's the issue. The MDA preempts claims challenging the design, manufacturing, or labeling of class three devices. Now, we have not challenged or alleged that the product was defective. We have not challenged or alleged that the labeling was defective. And if you go to CFR Title 21, which is Food and Drugs, Chapter 1, Food and Drug Administration, Part 801, labeling, as it relates to these medical devices, the only things that are addressed is what is the content and symbols used as part of the labeling process. And we have not challenged the content or the label. And we have cited two cases. And I talked about the Medtronic versus Mallinder case. And the plaintiffs argued that their claim was not preempted because it involved negligent and misrepresentations by Medtronic technicians, not the device's labeling. The FDA has not regulated interactions between representatives and physicians on site at a patient surgery. There was no challenge to the design, manufacturing, or labeling. And it was held preemption alleging negligent interaction between, there was no preemption in this case. And I know I've got about another minute, so I want to talk about this Carrillo case. Because there's two ways to skin the preemption case argument. The first is saying it simply doesn't apply. Interestingly enough, Carrillo, there was an allegation that there was a failure to provide the on-labeling warning regarding the life of the battery. And in this particular situation, the court said the plaintiffs are not advocating for labeling that's different from or in addition to that, which has already been approved by the FDA. The failure to warrant claim is a parallel claim and therefore not preempted. So you can say that they have not extended anything beyond what the FDA requires. And I think the Carrillo case, quite frankly, is really not, is not correct. I think the reasoning of Maldner is correct. I don't think that there's anything in these FDA regulations that address how the label is disseminated or delivered. Therefore, there can be no preemption when we are not arguing about products. And the defendant, Apolli, all the cases that she has cited deal with product liability cases, challenging the adequacy of the warning, challenging the product itself. Those are preempted. Thank you. I've just been told no time. All right. We'll hear from you on rebuttal. For the Apolli. Good afternoon, Your Honor. Alana Eisenstein, may it please the court. So. Plaintiff has sought recovery, as he's just asserted, due to Mr. Clayton's death, which he asserts was due to baclofen withdrawal. And he acknowledges that this occurred after a nurse punctured the catheter while refilling his Medtronic synchromed infusion pump. And according to plaintiff, that led to the under infusion of baclofen. But Medtronic was properly granted summary judgment for a few reasons. First, Mr. Shea acknowledges that the technical sales representatives had a limited duty. I think that the debate here is what the scope of the duty entailed. And he tries today to assert that that scope of the duty should be determined based on their resume, based on general job description. To the contrary, the legal duty is determined by what was undertaken on the day in question. And it is clear that the Medtronic representative, Ms. Wooley, who came to the hospital, had a very limited duty. She was asked by the doctors to do one thing and one thing only, which is to interrogate the pump, meaning to externally read the data off of the pump to determine whether the data reflected that the pump was functioning. She did that. She did it accurately. And it showed the truth, which was that the pump was working. The pump was working as it was intended. It was delivering the amount of medication that it was supposed to deliver. Now, what it cannot tell is whether it is going into the proper spot in the body. And that was unfortunately the problem here. Unbeknownst to her, the catheter had been punctured, meaning that instead of the medication reaching all the way into the interthecal space, the medication was going into other parts of the body. So the pump was doing its job, delivering the medication, and the test that she was asked to perform was discharged appropriately. He wants to impose, plaintiff, on Ms. Woolley and Medtronic an additional set of duties. He wants her to have offered, affirmatively, other reasons why it may be that the patient may have been sick. But the information imbalance that he cites is completely in the other direction. He asserts that it's Ms. Woolley who has the informational advantage. No, it was her who had no information. It's undisputed that she knew almost nothing about the patient's condition. She had not seen the patient other than to do this very limited procedure. She didn't have his medical records. And indeed, there were very good reasons why the differential diagnosis here was extremely complex. The emergency room doctor testified that he suspected sepsis and a urinary tract infection for very good reason. In fact, the evidence, I think, is fairly undisputed that he was suffering from sepsis. The blood tests and the urinalysis showed those things. This was a very sick patient. And so it was far from obvious that baclofen withdrawal would have risen to the top of the differential diagnosis or the only diagnosis. And certainly not obvious to Ms. Woolley, who had access to none of those blood tests or other information. She is not a doctor and not a health care provider. And so what he really wants is for her to have interjected herself into the medical care of Mr. Clayton. And the Kennedy case, as Mr. Shea raised that case, and we've certainly relied on it, controls here. That case is on all fours with this case. In that case, just like in this case, the physician asked the Medtronic sales representative, technical representative, to read data in that case from a pacemaker that was implanted to determine whether the pacemaker was working. The Medtronic representative did that. It showed it was working. And what it didn't show was whether the lead was properly placed. Unfortunately, the lead in Kennedy was not properly placed and the patient suffered adverse consequences as a result. And just like here, the court properly granted summary judgment for Medtronic, because the court found that it was not the Medtronic sales representative's duty to offer whether or not there could be other problems in the implantation of the device. Rather, his duty was limited to the reading of the pacemaker device, which he discharged faithfully. The difference in the Melander case was how the limited duty was discharged. So in that case, it was a defibrillator device. And the Medtronic representative incorrectly stated that the pattern that was reflected in the testing showed nothing was wrong and that there was nothing to worry about, when in fact there was. That particular pattern indicated a problem with the device. So the difference here is key, which is that Wooley discharged her duty faithfully by reading out the data and reporting factually on what it reflected. There's no debate about that, no dispute about that. What Kennedy says is, no duty to go above and beyond that for a Medtronic representative in exactly the same position. And Melander says, well, if she had done it wrong, we would be in a different position. So on the duty question, it is clear that the circuit court got it right. I also want to say a few words about this additional duty that plaintiffs suggest to provide the additional labeling information. So that's the other place in which there's not an information imbalance. Medtronic, through its FDA approved label, has information about baclofen withdrawal. This very risk, including the risk of catheter break, puncture, or leakage, is in the label. And the physician has access to the label. Even the ER physician has access to the label. Indeed, they later accessed the label. The fact that they, the physician, didn't access the label to find that information, which was available to them, as well as available to Wooley on an equal basis at that time, is not the fault of Medtronic. Medtronic followed the PMA, the premarket approval requirements in this case. And the plaintiff has pointed to no violation of those requirements. And that goes both to the state law duty as well as to the preemption issue. I'll say on that, since we're on preemption, a few words about the preemption issue, which is that plaintiff Mr. Shea suggests that federal law doesn't govern the manner in which federal labeling is provided to physicians. That could not be further from the truth. The PMA specifies in great particularity how the label appears, what the label says, and the manner in which it's provided. Now, what Mr. Shea is asking is to impose an additional duty on Medtronic to proactively offer the label in a manner that federal law does not require. And to avoid federal preemption, and Melander says this, to avoid federal preemption, plaintiff has to show that by failing to offer proactively fax over the label or to hand over an additional copy of the on-label information, that that violated federal requirements. When, of course, it did not. Medtronic complied with federal requirements and having the label as the FDA approved it. And what we express preemption provision provides, that's 21 U.S.C. section 360 K.A., is that any state law requirement that's in addition to or different from those federal requirements is preempted. And that's exactly what plaintiffs seek, is to impose an additional affirmative requirement on Medtronic to provide the labeling information in a manner different than what FDA has prescribed. Let me ask a question. How is the information on the label or the labeling, how is that available to the physicians? So, in the emergency room context, it's available, among other things, on an online website about the device. So it's available online, as well as obviously with the packaging on the label itself. And so it's really readily available also on the Medtronic website. On the packaging, is all the information available or does it refer you to the website? I believe that all the information is on the packaging, contained with the information that comes with the packaging itself. That's the label that accompanies the package. But it's also reflected in the online information, which also includes FDA approved information about emergency situations just like this and how to troubleshoot them. So that's something that physicians can, and in fact did in this case, consult to determine what to do. So this isn't information uniquely in the possession of Ms. Woolley or Medtronic at the time that this incident was occurring. If you know, would this be the way that your other devices are also delivered with the label devices, other than this particular one, that there is labeling and that is available on the packaging, and then you can also go online. If you were in an emergency situation and access it. As far as I know, the labels are available online. So, and that's something that someone in an emergency room physician, you know, would typically know or to consult with as I think what's happened here. So, Mr. Shea has pointed out that the emergency room physician who I believe was named Mr. Dr. Austin may not have had experience with this particular condition, but the record reflects he consulted neurologist that he consulted he was in a medical center consulted with specialist, who did. And indeed the nurse who had the, the refill that went astray nurse Kaufman was part of the same medical system and so those records were available to the emergency room doctor as well. In contrast, they were not available to Miss Willie, who had no access to that, to that medical record, including he, I think Mr Shea referenced the difficult refill as somehow putting Miss Willie on notice that the catheter could have been an issue it's not clear from the record at all that Miss Willie knew that information at the time at the relevant time which is when she interacted with the physician and interrogated the pump, or that she would have ascertain the significance of that. That's not her job. And as plaintiff acknowledges to speculate about what could be the cause of the symptoms and question, she's asked a very direct question. Can you interrogate the data on the pump. And is it working, she was also able to pull the data from the time of the refill and she did that, and did it faithfully. Also, if I understand what you just said, you do dispute in whether Willie was aware of the prior difficulties in refilling the pump. You're saying the record is not clear on that is that would I hear that correctly. That's correct. I don't know that she was aware of it at the time that she for example, reported out on the information to the medical team I believe that she learned that from the family and the waiting room so I don't even think that she learned that from the medical records are from the hospital system itself. Well if she was aware of the record shows that she was aware that there had been difficulty refilling the pump. Does that. Is that a fact that we should consider in the duty analysis, or does it matter anymore. I don't think it matters here because of the, because of the nature of the particular interaction here. So here, there was not a conversation with the medical staff about the difficult refill. There was nothing further there was no deeper discussion where she was being asked to do anything other than this extremely targeted procedure which is to come drive in at night, I think at the time she got there was 11 at night to the hospital, read out the data on the pump report the data, and she was not involved in a back and forth, if you will, with the medical team on what could be the cause of this. Mr. Clinton symptoms that was wholly and within the sphere of the medical team in the emergency room and later in the hospital that we're taking care of Mr. Clinton. So, so I want to just, you know, talk about in terms of this duty to warn or the duty to offer information that this court has been clear that there is no such affirmative duty unless it's undertaken, and that the scope of voluntarily undertaken duties which here is this interrogation of the pump is subscribed by the circumstances and the circumstances here, show what a narrow role, Miss Willie played on the day in question. She had no information about Mr. Clinton. You know, other than the limited interaction that she had with him. She didn't have. There was no duty that the law places upon her to offer alternative explanations to the physicians and as Kennedy pointed out there's good reason for that there's a consequence of facing that burden on someone like Miss Willie to offer. Oh, did you think about the catheter, because investigating the catheter is something that can't be done externally. That's something that requires a die study, or that requires some other type of medical intervention because the catheter is actually inside the body. So it can't be ascertained or diagnosed externally the way the pump can. And so, if, for example, let's just say Miss Willie had offered, well, maybe you should look at the catheter. And it turns out that the patient had sepsis. And she threw the doctors off the scent of the sepsis and put them on to a catheter. You could see that we might be in a different position the shoe may have been on the other foot. And I think Kennedy pointed that out that that's exactly why you don't impose a duty on non physician sales representatives like this to offer opinions to offer additional information that interjects themselves into the medical care beyond what the physicians ask the physicians are the ones who need to ask the right questions, and the duty and discharge of the duty is on the representative to answer them faithfully. That was done here, and the circuit court properly granted summary judgment as a result. There are no further questions. I ask that you have from the decision granting summary judgment to the defendants. I see no questions so we'll hear from the appellant on rebuttal. I'm going to go directly to the deposition of Stephanie Willie starting on page 89 following questions were asked and she did following answers. Did you do any other troubleshooting other than interrogate the device, I did. And what was that I worked with the emergency room nurse to pull up Mr. Clemens most recently though, because I knew he had a refill recently to ensure that the way that this pump was currently programmed was intended by the provider who did that refill and make sure there wasn't any administration error programming error that could have been explained the complications, in which he was presenting the complications in which he was presenting to the ER with. And it matched. Did you speak to miss Mr Clemens mother at the time you are interrogating the device briefly. Did you obtain a history from either the physician the emergency room nurse or Mrs. Clemens that there was difficulty with the refilling this device on October 25, the family shared it. What did they tell you they had a difficult refill on October 25, and in her report title is suspected withdrawal. And even in her report she states, patient reports having difficult refill on 1025 2017 patient reports he felt fine that day, and he experienced increased spasticity starting on October 26, that continued to worsen. Now when we talk about the role of the representative because that's the word that was used by Council, the role of the representative and this is the dictate to the employees and technicians and representatives, when providing technical support because this is what the medical technician. I did not cite a case that said that it's when you have you didn't cite a case or there is no such case. I didn't cite a case I'm sure there are cases that say, if you have a job description, and you approach a certain particular situation you are to conduct yourself within the scope of the job description, so that the internal job description creates the legal duty. Yes, because she is told as her job as a technician is to provide in depth knowledge directly to the physicians. Did Dr. Austin, ask her opinion. No, no, he, he was simply told that the pump was functioning fine. She knew there were difficulties. She knew that by her training that there were significant issues that could exist with respect to the catheter, that could cause the back with any withdrawal in depth product knowledge, or in depth product support, and she didn't do that. And since I got only just a couple minutes, I just want to say, this is a summary judgment, your honor. This is a very drastic remedy. And what counsel didn't say, especially with the preemption, is that there is any that the delivery is part of the labeling process, the labeling process. There is a label when it's implanted with the device itself, Justice Connect. And then there is the maintenance of that device by the neurology clinic. And then he goes into the emergency room, and oddly enough when the call was made the next day for troubleshooting, quite different from what counsel indicated, they didn't go online and look at the Medtronic on-label documents, they called the 1-800 number and reach somebody for troubleshooting. So the on-label document that was ultimately provided to them was not by way of the internet, but by way of a facsimile sent at 1044 AM from the troubleshooter at Medtronic, which time is of the essence, and that should have been provided the day before. If there is suspicion that there is something that's preventing the delivery of this intrathecal baclofen, then that information should have been provided. And I also want to suggest to you that she then left the impression that this device was functioning appropriately, and he went into a different direction. And if he would have seen that document that was delivered the next day, he would have read, as is part of the record, that baclofen withdrawal syndrome may resemble sepsis. Thank you, counsel. We appreciate your arguments, and we'll take this matter under advisement and await the readiness of the next case.